UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FREDRICK BERNARD LEWIS, *et al* | § | CIVIL ACTION NO.  4:18-cv-00311 |
| | § | |
| V. | § | |
| | § | |
| OWEN J. MURRAY, *et al* | § | |

## PLAINTIFFS' THIRD AMENDED COMPLAINT

## **TABLE OF CONTENTS**

Table of Contents .................................................................................................. 2

Nature of the Case ............................................................................................... 4

Parties ................................................................................................................. 5

Jurisdiction .......................................................................................................... 8

Venue .................................................................................................................. 8

Factual Background ............................................................................................. 8

    A.    Cornelius is incarcerated ....................................................................... 8

    B.    Cornelius is routinely denied his medication while in TDCJ/UTMB custody ................................................................................................ 10

    C.    Medical personnel at the Ferguson Unit ignore obvious warning signs that their failure to provide Cornelius with his medication is going to cause him to harm himself or others ........................................ 15

    D.    The Ferguson Unit has a policy or custom of critical understaffing of medical personnel which deprives inmates of their prescribed medications .............................................................................................. 19

Causes of Action ................................................................................................. 20

    A.    Claims under 42 U.S.C. § 1983 and Eighth and Fourteenth Amendments to the U.S. Constitution as to all Defendants ................ 21

        1.    Claims against Dr. Murray and Dr. Linthicum .......................... 21

        2.    Claims against the Nurses ........................................................ 24

        3.    Claims against Sheri Nichols-Woodward ................................. 28

    B.    Qualified Immunity Under § 1983 ........................................................ 29

    C.    Title II of ADA and RA claims against UTMB .................................... 31

Damages .............................................................................................................. 33

Attorney's Fees and Costs .................................................................................. 35

Relief Requested ........................................................................................................35

Jury Demand ...............................................................................................................36

Prayer .........................................................................................................................36

Certificate of Service .................................................................................................37

TO THE HONORABLE UNITED STATES DISTRICT COURT:

COMES NOW, FREDRICK BERNARD LEWIS a/k/a FREDERICK BERNARD LEWIS, in his capacity as the father of CORNEILUS DESHUN LEWIS, aka Cornelius Lewis,[1] deceased, and as an heir-at-law of CORNELIUS DESHUN LEWIS and JANICE MARIE CLOSE, in her capacity as mother of CORNELIUS DESHUN LEWIS deceased, and as an heir-at-law of CORNELIUS DESHUN LEWIS, deceased, ("Plaintiffs") and on behalf of, and for the benefit of, all wrongful death beneficiaries, complaining of the OWEN J. MURRAY, LANNETTE LINTHICUM, MICHAEL W. UTLEY, LVN, NICOLE M. BERTRAM, LVN, VIRGINIA LOVELL, RN, MELISSA A. HARRIS, LVN, SHERI NICHOLS-WOODWARD, LPC (each individual Defendant hereafter will be referred to by their last name), and the UNIVERSITY OF TEXAS MEDICAL BRANCH ("UTMB") for cause of action would respectfully show unto this Honorable Court as follows:

## I.   <u>NATURE OF THE CASE</u>

1.      This is a civil action arising under the United States Constitution, particularly under the provisions of the Due Process Clause and the Eighth and Fourteenth Amendments to the Constitution of the United States, and under federal law, particularly the Civil Rights Act, Title 42 of the United States Code, Section 1983, and Title II of the Americans with Disabilities Act (42 U.S.C. § 12131, *et seq*.) and the Rehabilitation Act (29 U.S.C. § 794) seeking damages against Defendants for committing acts, under color of law, with the intent and for the purpose of depriving Cornelius Lewis and Plaintiffs of rights secured under the Constitution and laws of the United States.[2]

---

[1] All TDCJ and UTMB records show decedent's name as Cornelius.  In his birth certificate, it is spelled Corneilus.
[2] Although Plaintiffs refer to Defendants collectively at times, specific factual references are made concerning actions or inactions by specific defendants throughout this complaint – these are not global allegations.  As such, this pleading complies with current federal standards.  FED. R. CIV. P. 8 & 9.

## II.   **PARTIES**

2.      Decedent, CORNELIUS DESHUN LEWIS ("Cornelius"), was at the time of the incident made the basis of this action, an individual in the custody of the Texas Department of Criminal Justice at the Jim Ferguson Unit (the "Ferguson Unit") in Madison County, Texas.[3]  At the time of his death, Cornelius had no surviving spouse and had no surviving children.  Cornelius died intestate. [4]

3.      Plaintiff, FREDRICK BERNARD LEWIS a/k/a FREDERICK BERNARD LEWIS ("Fredrick"), father of Cornelius, is a citizen of the United States currently residing in Angelina County, Texas.  Fredrick is Cornelius's biological father and one of two heirs-at-law of Cornelius.  Plaintiff Fredrick Lewis brings the survival claims as an heir of Cornelius because no estate administration is pending, and none is necessary.

4.      Plaintiff, JANICE MARIE CLOSE ("Janice"), mother of Cornelius, is a citizen of the United States currently residing in Angelina County, Texas.  Janice is Cornelius's biological mother and one of two heirs-at-law of Cornelius. Plaintiff Janice Close brings the survival claims as an heir of Cornelius because no estate administration is pending, and none is necessary.

5.      Defendant, OWEN J. MURRAY ("Dr. Murray"), is the Vice President for Correctional Managed Care for the University of Texas Medical ("UTMB").  UTMB-Correctional Managed Care provides medical, mental health and dental services to more than 126,000 offenders within the Texas Department of Criminal Justice, or some 80% of the state's inmate population.[5]  Dr. Murray is the Executive Director of Clinical Services, Chief Physician Executive for the UTMB

---

[3] Cornelius was assigned Offender No. 1978929 by TDCJ.
[4] In Texas, when a person dies intestate and without a spouse and without children, his estate is devised in equal portions to his father and mother.  TEX. ESTATES CODE § 201.001(c).
[5] University of Texas Medical Branch, *Correctional Managed Care*, https://www.utmb.edu/cmc (last visited Apr. 18, 2018).

Correctional Managed Care program.  Dr. Murray has already made an appearance in this matter and may be served through his counsel.

6.      Defendant, LANNETTE LINTHICUM ("Dr. Linthicum"), is the head of the Health Services Division for the Texas Department of Criminal Justice ("TDCJ").  The Health Services Division of TDCJ has "statutory authority (state law) to ensure access to care, monitor quality of care, investigate medical grievances, and conduct operational review audits of health care services at TDCJ facilities."[6]  Dr. Linthicum has already made an appearance in this matter and may be served through her counsel.

7.      Defendant, MICHAEL W. UTLEY, LVN, was employed by UTMB and contracted to TDCJ and was acting within the scope of his employment and under color of statutes, ordinances, rules and regulations, customs, and usage of TDCJ and/or UTMB.  At the time of the incident, LVN Utley assumed his role as a licensed vocational nurse.  LVN Utley has already made an appearance in this matter, but was dismissed without prejudice and with the right to replead. [Dkt. # 84].  Service of this complaint can be made by serving his counsel of record.

8.      Defendant, NICOLE M. BERTRAM, LVN, was employed by Right Healthcare Solutions, and contracted to UTMB and TDCJ.  At the time of the incidents made the basis of this suit she was acting within the scope of her employment for UTMB and under color of statutes, ordinances, rules, and regulations, customs, and usage of TDCJ and/or UTMB.   At the time of the incident, LVN Bertram assumed her role as a licensed vocational nurse directed and supervised by UTMB.  LVN Bertram has filed an appearance herein and may be served by serving her counsel.

9.      Defendant, VIRGINIA LOVELL, RN, (aka Virginia Robinson) was employed by UTMB

---

[6] Texas Department of Criminal Justice, Health Services Division,
https://www.tdcj.state.tx.us/divisions/hsd/index.html (last visited Apr. 18, 2018).

and contracted to TDCJ and was acting within the scope of her employment and under color of statutes, ordinances, rules and regulations, customs, and usage of TDCJ and/or UTMB.  At the time of the incident, RN Lovell assumed her role as a registered nurse/nurse manager.  RN Lovell has already made an appearance in this matter, but was dismissed without prejudice and with the right to replead.  [Dkt. #84].  Service of this complaint can be made by serving her counsel of record.

10.     Defendant, MELISSA A. HARRIS, LVN, was employed by UTMB and contracted to TDCJ and was acting within the scope of her employment and under color of statutes, ordinances, rules and regulations, customs, and usage of TDCJ and/or UTMB.  At the time of the incident, LVN Harris assumed her role as a licensed vocational nurse.  LVN Harris was served via publication pursuant to the Court's Order. [Doc. 50].  Ms. Harris has not made an appearance and is in default.

11.      Defendant, SHERI NICHOLS-WOODWARD, LPC is employed by UTMB and was acting in the scope of her employment and under the color of statutes, ordinances, rules and regulations, customs, and usage of TDCJ and/or UTMB.  At the time of the incident, Nichols-Woodward assumed her role as a licensed professional counselor.  Nichols-Woodward can be served at an address to be provided under seal to the Court given the nature of her employment for a law enforcement agency.[7]

12.     Defendant, UNIVERSITY OF TEXAS MEDICAL BRANCH ("UTMB"), is a governmental entity located within the State of Texas.  UTMB made an appearance in this case, but was dismissed on May 16, 2018.  Service of this complaint can be made by serving its

---

[7] A motion to add this party is filed currently with this complaint.  A summons will be requested if the Court grants the motion to add new parties.

counsel of record.[8]

### III.    JURISDICTION

13.    This action is brought pursuant to 42 U.S.C. § 1983 and the Due Process Clause and the

Eighth and Fourteenth Amendments to the United States Constitution as well as Title II of the

Americans with Disabilities Act (42 U.S.C. § 12131) and the Rehabilitation Act (29 U.S.C. §

794).  The Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343.

### IV.    VENUE

14.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because the acts, events or

omissions giving rise to this claim occurred in Madison County, Texas, which falls within the

United District Court for the Southern District of Texas, Houston Division.

### V.    FACTUAL BACKGROUND

#### A.    Cornelius is incarcerated.

15.    On December 29, 2014, Cornelius was sentenced by the 159th District Court in Angelina

County, Texas to three years' imprisonment in TDCJ for two counts of robbery and unlawfully

carrying a weapon.

16.    Cornelius was just 19 years-old at the time he was sentenced.  He had never been in

TDCJ custody before.  Despite his young age, Cornelius exhibited signs and symptoms

associated with mental illness and was prescribed medication to treat mental illness.

17.    On February 23, 2015, Cornelius was processed at the Reverend C. A. Holliday Transfer

Facility (the "Holliday Unit") in Huntsville, Texas.  The Holliday Unit is a TDCJ intake and

transfer facility for incoming offenders.  After being processed and screened at the Holliday

Unit, offenders are typically assigned to another TDCJ facility for service of their sentence.

---

[8] A motion to add this party is filed currently with this complaint.  UTMB should file an answer 30 days after the
Court rules on the motion to add new parties, if said motion is granted.

18.     As part of his initial processing, Cornelius was given a medical screening and evaluation by TDCJ/UTMB medical personnel.  A clinic note on February 23, 2015 records that upon transfer to TDCJ, Cornelius was receiving the following medications: Bupropion (Wellbutrin – anti-depressant), Propranolol (high blood pressure), Hydroxyzine (anti-anxiety) and Olanzapine (anti-psychotic) at the county jail.  In the clinic note, the medical providers discontinued these medications and ordered Sertraline (Zoloft) and Risperidone – one a day for 30 days, no refills.

19.     On February 26, 2015, Cornelius received another mental health screening.  Cornelius advised that he suffered from mental illness and was taking medication for it.  This information is clearly noted on Cornelius's "Correctional Managed Care Intake History and Health Screening" form.  Accordingly, TDCJ and UTMB and their medical personnel were put on notice that Cornelius: (1) suffered from mental illness and (2) required medication.  During the February 26th evaluation Cornelius was referred to TDCJ's Developmentally Disabled Program (DDP) at the Hodge unit because of the scores he received during screening.

20.     A physician at the Hodge Unit ordered testing for Cornelius on March 10, 2015.  Cornelius' behavior at the Hodge Unit started out as friendly and compliant.  However, by March 26, 2015, Cornelius was missing appointments, becoming aggressive and acting strangely.

21.     On March 30, 2015, Janice spoke with Nicholas Houston, a TDCJ/UTMB mental health case manager at the Hodge Unit, regarding her concerns about Cornelius after her recent visit.  Janice reported that his behavior was odd and that something was bothering him.  The intake was referred to Efraim Reese, a licensed professional counselor.

22.     Reese visited with Cornelius three days later, on April 2, 2015, while he was still at the Hodge Unit.  Reese noted that Cornelius denied any problems, but that his behavior declined

rapidly during the interview, becoming disengaged.

23.     Ultimately, UTMB denied Cornelius' admission to the DDP program and he rotated back to the Holliday Unit by April 22, 2015.

**B.     Cornelius is routinely denied his medication while in TDCJ/UTMB custody.**

24.     Although a QMHP (qualified mental health provider) had ordered Zoloft and Risperidone at his first admission at the Holliday Unit, Cornelius did not receive any medication while at the Hodge Unit.

25.     On June 11, 2015, after transfer back to the Holliday Unit, Frances E. McGinnis ("McGinnis"), a clinical nurse specialist in psychiatry/mental health, again prescribed Cornelius Sertraline (50mg) and Risperidone (1mg) to be taken every evening for 30 days with 11 refills. During his interview with McGinnis, Cornelius clucked his tongue and spoke in a monotone voice.

26.     Sertraline is an antidepressant used to treat various forms of mental illness, including depression, obsessive-compulsive disorder, panic disorder, anxiety disorder, and post-traumatic stress disorder.  Risperidone is an antipsychotic medication used to treat schizophrenia and bipolar disorder (manic depression).

27.     Four days later, Cornelius was transferred to the Byrd Unit.  Despite McGinnis's order prescribing Sertraline and Risperidone daily, medical records show that Cornelius was again not given his medication for extended intervals:

> From June 15, 2015, through June 29, 2015, Cornelius was not given Sertraline or Risperidone.  Over the period from June 11, 2015, to July 10, 2015, the compliance percentage for Cornelius receiving his mediation was 36.67%.  Records indicate that Cornelius refused his medications on July 8, July 9, and July 10.

28.      On July 23, 2015, Cornelius was transferred to the Ferguson Unit.  **According to the TDCJ website, the Ferguson Unit's maximum capacity is 2,100 inmates and has 11 contract**

medical employees and 3 mental health employees.[9]   Medical and mental health employees are provided to the Ferguson Unit, and TDCJ generally, through UTMB. The Ferguson Unit does not have twenty-four hour medical or mental health care services available.  Instead, medical staff is available 14-15 hours on Monday through Friday and 12 hours each day of the weekend.

29.     A mental health transfer screening was done at the Ferguson Unit on July 24, 2015, noting Cornelius' current mental health treatment and PULHES[10] of 3NR with alert code of 295.7. PULHES "3N" means a serious mental disorder, depressive disorders with psychosis, psychosis disorders, or organic brain syndrome. The "R" means the condition is remediable. Alert code 295.7 means schizoaffective disorder or schizophrenia.

30.     At his first psychological evaluation at the Ferguson Unit on July 27, 2015, it was noted that the medication compliance rate at that point was under 50%.  Cornelius was also seen due to a security referral because Cornelius "appeared scared to death."  Although the mental health counselor reported that Cornelius was "refusing his medication," the medication compliance report shows only three refusals in the last 47 days.

31.     Similarly, a month later, on August 25, 2015, Duane Gougler, a mental health case manager recorded that Cornelius was not taking his meds because of their affect; yet, no nurse had documented any refusal.  Pursuant to policy, failure to give medication must be recorded, along with the reason why it was not given.  At that time, Cornelius was to be continued on monthly mental health monitoring.

32.     On August 31, 2015, Cornelius is seen for the first time by Sheri-Nichols-Woodward, a licensed professional counselor, for a pre-segregation assessment after an altercation with

---

[9] While the website states the Ferguson Unit's capacity is 2,100 inmates, the number actually housed is much higher. *See* ¶ 75, *infra.* Moreover, while the website claims a total of 14 medical employees, the actual number working is far, far less. *See* ¶ 75-79, *infra.*
[10] PULHES is a profile serial system classifying physical abilities:  physical capacity; upper extremities; lower extremities; hearing; eyes; and psychiatric/mental health.

another inmate.  Nichols-Woodward signed her electronic record three days later on September 3, 2015.  It was reviewed and signed off by Nurse Practitioner Wanda Isabell fifteen days later, on September 18, 2015.

33.    From July 23, 2015 until September 3, 2015, the Ferguson Unit's medication compliance rate never broke 40%:

   a.    Cornelius was not given Sertraline or Risperidone from July 23, 2015, until August 10, 2015.  Over the period from July 11, 2015, to August 10, 2015, the compliance percentage for Cornelius receiving his medication was 40%.

   b.    Cornelius was not given his Sertraline or Risperidone from August 11, 2015, until August 28, 2015.  Over the period from August 11, 2015, until September 3, 2015, when Sertraline and Risperidone were stopped, Cornelius was only given his medication on August 28, September 1, September 2, and September 3.

34.    On September 3, 2015, Cornelius was seen by John Q. Wang ("PA Wang"), a physician's assistant, for an initial psych evaluation to prepare an Individualized Treatment Plan for Psychiatry Chronic Care.  The evaluation was conducted via telemedicine because there was no psychiatrist at the Ferguson Unit.  Gougler was present as well.

35.    PA Wang recorded a self-report of prior hanging incident and previous free world psych hospital stays, erratic behavior, poor ability to comprehend and anxiety.  Noting that Cornelius' judgment and insight was impaired, Wang considered a referral back to the DDP program at the Hodge Unit.  Wang diagnosed "anxiety disorder, rule out psychotic disorder, borderline intellectual function and ASPD (anti-social personality disorder)."  PA Wang recorded a PULHES of S-2 BT -- psychiatric-non-serious depressive disorder, temporary.  PA Wang terminated the Risperidone and Sertraline (Zoloft) and instead ordered Citalopram, an anti-depressant to be given every evening for 30 days with 11 refills.

36.    Despite Wang's order that Cornelius was to be given Citalopram every evening, medical records show that Cornelius was not given his medication for extended intervals:

a.   Cornelius was not given Citalopram on September 30, 2015, and October 1, 2015, and October 3, 2015.  Over the 30-day period from September 3, 2015, to October 3, 2015, the compliance percentage for Cornelius being given his medication was 90%.

b.   Cornelius was not given Citalopram on October 5, 2015, October 7, 2015, October 8, 2015, and October 24, 2015.  Over the period from October 3, 2015, to November 2, 2015, the compliance percentage for Cornelius receiving his medication was 80%.

c.   Cornelius was not given Citalopram on November 15, 2015, November 27, 2015, and November 30, 2015.  Records indicate that Cornelius refused his medications on November 29, 2015, and December 1, 2015.  Over the period from November 2, 2015, to December 2, 2015, the compliance percentage for Cornelius receiving his medication was 80%.

d.   Cornelius was not given Citalopram from December 2, 2015 until December 15, 2015, on December 19, 2015, on December 23, 2015, and December 29, 2015.  Over the period from December 2, 2015, to January 1, 2016, the compliance percentage for Cornelius receiving his medication was 40%.

e.   Cornelius was not given Citalopram on January 18, 2016, January 24, 2016, January 25, 2016, January 29, 2016, and January 30, 2016.  Over the period from January 1, 2016, to January 31, 2016, the compliance percentage for Cornelius receiving his medication was 83.33%.

f.   Cornelius was not given Citalopram on February 3, 2016, February 12, 2016, February 13, 2016, February 19, 2016, and February 26, 2016.  Over the period from January 31, 2016, to March 1, 2016, the compliance percentage for Cornelius receiving his medication was 80%.

g.   Cornelius was not given Citalopram on March 1, 2016, March 5, 2016, and March 11, 2016.  The medicine was unavailable on March 11, 2016.  Citalopram was stopped on March 14, 2016.

Meanwhile, during the sporadic delivery of medication, Cornelius became a frequent visitor of

the medical and mental health providers.

37.   On August 27, 2015, Cornelius cut his finger with his razor after not receiving his

medication since July 23, 2015.  Additionally, on August 31, 2015, Cornelius was involved in an

altercation with another offender and suffered minor injuries.

38.   On October 6, 2015, Cornelius was seen by Nichols-Woodward on a staff referral after

Cornelius submitted a grievance stating he was starting to want to kill himself.  Upon evaluation, he told Nichols-Woodward he was hearing voices.  Nichols-Woodward recorded "no current mental health needs."

39.     That same day, on October 6, 2015, Cornelius submitted a sick call. He was seen three days later by Nichols-Woodward who noted his medication compliance was now 75%. During that time frame only two refusals were noted.

40.     On December 7, 2015, Cornelius submitted a sick call request complaining that neither medical or Nichols-Woodward had been to see him and he needed to speak with her.  Nichols-Woodward saw him on December 10, 2015, and recorded that he had no current mental health care needs.

41.     On December 12, 2015, Cornelius filed a complaint that he was not being given his medication.  Cornelius was then was given his medication on December 15, 16, 17, and 18, 2015.  Cornelius was not given his medication on December 19, 2015.

42.     On December 19, 2015, at 9:42 p.m., Cornelius was seen by medical personnel for a laceration on his left forearm.  It was suspected that the laceration was self-inflicted.

43.     On December 23, 2015, Cornelius saw Nichols-Woodward after being sent to segregation for refusing to go to general population.  His medication compliance rate was 71.79% with no documented refusals. Indeed, between December 1, 2015 and December 15, 2015, Cornelius received no medication at all. Nor did he receive any medication the day after his visit.

44.      On January 11, 2016, Cornelius put in a mental health sick call stating he needed to speak with a nurse as soon as possible. Although she marked the request received the same day, Nichols-Woodward saw him three days later. At the time, Cornelius stated he was in fear of his safety. His medication compliance rate was 75.37%.  No refusals of medication were recorded.

45.     Cornelius submitted another mental health sick call request on or about January 19, 2016, stating he needed to see a nurse fast. Nichols-Woodward marked the request received the same day.  Cornelius wrote again to Nichols-Woodward with concerns about his safety on January 21, 2016.  Nichols-Woodward finally saw him that day. She stated he was currently "in transient pending OPI (offender protection investigation) again."

46.     On February 4, 2016, Cornelius submitted a mental health sick call request. He was seen by Bobby Gardner who noted a 75% mediation compliance rate. There were no refusals noted. Cornelius was concerned about his safety.

47.     On February 10, 2016, Cornelius submitted another sick call request stating he needed help. He was seen by Nichols-Woodward two days later. At the time his medication compliance rate was 75.46% with no refusals.

48.     Cornelius submitted requests on February 16, 2016, and February 17, 2016, about his safety. He was seen by Nichols-Woodward on February 17, 2016.  He stated that everyone on his unit was trying to hurt him. Nichols-Woodward noted a 75% medication compliance but no current mental health needs.

**C.     Medical personnel at the Ferguson Unit ignore obvious warning signs that their failure to provide Cornelius with his medication is going to cause him to harm himself or others.**

49.     On March 3, 2016, Cornelius missed his psych telemedicine appointment because there were no officers available to bring him to the medical department.

50.     On March 9, 2016, Cornelius was seen by Nichols-Woodward on a staff referral for self-injury. His medication compliance rate was 75%. She recorded thoughts of self-injury, but later wrote that Cornelius denied plans for self-injury.

51.     On March 10, 2016, Cornelius was seen by PA Wang for a telemedicine psych

evaluation. PA Wang recorded that his anxiety was in remission and that Cornelius stated he had

no mood issues and no longer needs meds. PA Wang noted a compliance rate of 77.5%. Wang

stopped all medications and psych services.

52.    Just three days later Cornelius submitted a mental health sick call request stating he was

having trouble with his Celexa, was starting to feel aggressive and wanted to try Zoloft.  This

directly contradicts PA Wang's medical notes of March 10, 2016, that Cornelius no longer

wanted or needed his medication.  Nichols-Woodward received this request on March 14, 2016.

Cornelius was seen on March 15, 2016, by Gougler.  There is no indication that a psychiatrist or

even PA Wang was consulted.  Instead, Gougler simply told Cornelius he wouldn't get any more

medication.

53.    Cornelius submitted another sick call request on March 21, 2016, stating he needed to

speak with mental health.  He was seen by Nichols-Woodward three days later.  She simply

reminded him that he would get no medication. There is no consultation with PA Wang or a

psychiatrist.

54.    Again, on March 29, 2016, Cornelius submitted a sick call request to Nichols-Woodward

stating he needed his "meds" and asking for medication to calm him down.  He was seen the

following day by Gougler.  No meds were ordered and there was no referral to a psychiatrist or

nurse practitioner.

55.    On April 28, 2016, security staff wrote a referral to mental health stating that Cornelius

seemed paranoid, anxious, and fearful.  Nichols-Woodward signed for the referral on April 28,

2016.  That same day, Cornelius submitted a sick call request to mental health and stated he

"seriously needed help, that I've been cutting myself and trying to hang myself.  I need help".

56.    On April 29, 2016, it was determined that Cornelius needed transfer to crisis management

after he was seen by medical personnel for self-mutilation, but no bed was available.  Instead, he was placed on constant direct observation (CDO).  No one contacted a psychiatrist or PA Wang and no medications were provided.

57.     Three days later, on May 2, 2016, Cornelius submitted a sick call request stating he needed help, he was cutting himself, hanging himself, and eating off the ground.  On exam on the same day, Nichols-Woodward recorded that Cornelius denied all claims.  No referral to a psychiatrist was made. Instead, Nichols-Woodward determined he was not a suicide risk.

58.     Cornelius saw Nichols-Woodward on May 13, 2016, when he told her he was not doing well.  No referral was made to a psychiatrist or PA Wang.

59.     On May 18, 2016, Cornelius submitted another mental health sick call request.  He was seen by Nichols-Woodward on May 20, 2016.  No referral was made.

60.     Cornelius submitted two more sick call requests on May 24, 2016, and May 25, 2016, to mental health.  Nichols-Woodward saw him on May 26, 2016, and determined he was faking a psychotic episode. No referral was made.

61.     Cornelius submitted a sick call request on June 3, 2016, and was seen that day.  No referral was made.

62.     On June 6, 2016, there was a staff referral and a sick call request from Cornelius because he was threating self-injury.  Nichols-Woodward saw him, and recorded that he denied trying to hurt himself but was again requesting medication.  Nichols-Woodward finally scheduled him to see a doctor.

63.     On June 10, 2016, Cornelius submitted another sick call request asking why he hadn't received any help yet.  He was seen three days later by Bobby Gardner.

64.     On June 11, 2016, after not being given any medication since March 14, 2016, Cornelius

17

was allegedly involved in an altercation with his cell-mate.  Records indicate that Cornelius had lacerations of the letter "X" on his torso and cuts on both arms.

65.     Finally, on June 16, 2016, Cornelius was "seen" by PA Wang via telemedicine.  PA Wang gave Cornelius no rating, provided no assessment, except to simply list a diagnosis as Anxiety Disorder/Impulse Control Disorder.  Wang ordered Divalproex Sodium (500 mg), 2 tabs every evening.  Divalproex Sodium is used to treat manic bipolar disorder (manic-depressive illness).

66.     Although medication was ordered on June 16, 2016, Cornelius' first dose was given on June 18, 2016.

67.     Despite Wang's order that Cornelius was to be given Divalproex Sodium every evening, medical records show that he was not given his medication for extended intervals.

   a. Cornelius was not given Divalproex Sodium on June 17, 2016, June 25, 2016, July 1, 2016, July 9-10, 2016, and July 12-16, 2016.  Over the period from June 16, 2016, to July 16, 2016, the compliance percentage for Cornelius being given his medication was 66.67%.

   b. Cornelius was not given Divalproex Sodium from July 11, 2016, to July 21, 2016, on July 25, 2016, and July 29-31, 2016.  Between July 11, 2016, and July 31, 2016, Cornelius was only given his medication five times for a compliance rate of 25%.

68.     On June 29, 2016, another mental health sick call request was received from Cornelius. He was seen two days later by Nichols-Woodward. At that time his medication compliance rate was 75%.

69.     Additional sick call requests were received from Cornelius on July 5, 2016, and July 7, 2016.  He was seen by Gougler on July 7, 2016. At the time, his medication compliance was listed as 77%.  Gougler made no assessment and made no referral.

70.      On July 24, 2016, another mental health sick call request was received from Cornelius.

He was seen by Nichols-Woodward on July 27, 2016.  At that time his medication compliance rate was 54%.  Cornelius told Nichols-Woodward he was sick.

71.      On July 28, 2016, Cornelius submitted another sick call request wanting to speak with mental health.  He was seen by Gougler on July 29, 2016.  He told Gougler he wasn't getting his medications.

72.      Cornelius was also seen by medical personnel on July 29, 2016, two days before he was found hanging in his cell.  Cornelius complained that he was cold and wanted an extra pair of socks.  Medical personnel advised him that they could not provide extra outwear.  Despite seeing Cornelius and having the opportunity to administer his medication which he now had not received in two days, records show that medical personnel failed to provide him with his medication that day or the following day.

73.      On July 31, 2016, around 12:35 p.m., a TDCJ guard found Cornelius hanging in his administrative segregation cell from a bed sheet.  Medical personnel were called to Cornelius's cell, but efforts to revive Cornelius were unsuccessful.

74.      Cornelius was pronounced dead at 2:26 p.m., on July 31, 2016.  He was 21 years-old.

**D.** **The Ferguson Unit has a policy or custom of critical understaffing of medical personnel which deprives inmates of their prescribed medications**

75.      The Ferguson Unit's housing capacity is 2,100 offenders.  In March 2015, shortly before Cornelius arrived, it housed 2,431 offenders.  During the entirety of Cornelius' incarceration at Ferguson, there no psychiatrist assigned to the unit.  Instead, psychiatric services were provided via telemedicine from a physician's assistant.  In June 2015, there were 10 nursing staff positions assigned to Ferguson made up of LVN's and CMA's.[11]  Four positions were filled.  Six were vacant.  That number of medical personnel is woefully inadequate to provide proper medical

---

[11] A CMA is a certified medication administrator.

care, medication and monitoring to 2,400 offenders.

76.      In total licensed medical staff, there were 22 assigned provider spots.  Seven were

unfilled for a vacancy rate of 32%.  By TDCJ/UTMB policy any vacancy rate higher than 12 %

is unacceptable.

77.      Records from the November 2015 medical staff meeting show there were seven assigned

LVN positions, four were vacant.  There were three CMA positions, three were vacant.  Medical

staff reported 19 formal step-one grievances regarding medical care and 292 informal

grievances.[12]

78.      By the March 2016 medical staff meeting, the vacancy rate had not improved.  They were

still missing four LVNs and three CMAs (two positions were vacant and one was on a leave of

absence).

79.      By April, the LVN vacancy number remained the same.  One CMA spot was vacant and

one was still on leave.  In July, the month Cornelius died, there were no CMAs scheduled to

work.

80.      Between July 31, 2015, and July 31, 2016, the date Cornelius died, there were 81 offender

grievances received at the Ferguson Unit regarding offenders not being given their prescribed

medications.  *See* Exhibit "A."  The custom and practice of the Ferguson Unit was to routinely

deny inmates their needed medications.

## VI.  CAUSES OF ACTION

81.      Plaintiffs hereby adopt, incorporate, restate and re-allege paragraphs 1 through 80,

inclusive, regarding all causes of action.

---

[12] The informal grievance precedes a step-one greivance.

A.    **Claims under 42 U.S.C. §1983 and Eighth and Fourteenth Amendments to the U.S. Constitution as to all Defendants**

82.    Defendants, acting under color of law and acting pursuant to the customs and policies of TDCJ and UTMB deprived Cornelius of rights and privileges secured to him by the Eighth Amendment to the United States Constitution and by other laws of the United States, by failing to provide proper medical treatment, by failing to protect him and through indifference to his medical needs, in violation of 42 U.S.C. § 1983 and related provisions of federal law and in violation of the cited constitutional provisions.

83.    The Eighth Amendment's prohibition of "cruel and unusual punishments" imposes a duty on prison officials to "provide humane conditions of confinement."  TDCJ officials, along with UTMB officials who contracted with TDCJ to operate and manage the Ferguson Unit, are imposed the duty to ensure that inmates received adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates.

84.    Cornelius had a right secured by the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment to be free from deliberate indifference to his serious medical needs without due process of the law, while he was incarcerated by TDCJ at the Ferguson Unit.

1.    **Claims against Dr. Murray and Dr. Linthicum**

85.    Dr. Murray is the Vice-President for Correctional Managed Care for UTMB.  Dr. Linthicum is the head of TDCJ's Health Services Divisions.  UTMB and TDCJ have a contract through which UTMB provides medical care for offenders at more than 100 TDCJ facilities, including the Ferguson Unit.

86.    Dr. Murray and Dr. Linthicum serve on the Correctional Managed Health Care Committee ("CMHCC"), which oversees health care at TDCJ facilities and creates and maintains

a statewide health care plan for TDCJ offenders.[13]  With respect to the role of the CMHCC:

> The CMHCC coordinates the development of statewide policies for the delivery of correctional health care and serves as a representative forum for decision making in terms of overall health care policy. CMHCC representatives are empowered by their respective organizations to represent them on health care matters and make decisions that are binding on their organizations.[14]

Thus, Dr. Murray and Dr. Linthicum are policymakers and have a direct responsibility in the implementation of health care policies and procedures at TDCJ facilities, the management of health care services at TDCJ facilities, and the monitoring of health care services at TDCJ facilities.[15]  Further, as part of the CMHCC, Dr. Murray and Dr. Linthicum have actual knowledge of the ongoing lack of proper health care at TDCJ facilities, including at the Ferguson Unit.

87.     The elements of an Eighth Amendment claim based on unconstitutional conditions of confinement are:

  a.     The prison conditions resulted in an extreme deprivation of the minimal measure of life's necessities and

  b.     The defendants acted with deliberate indifference.

88.     Plaintiffs assert that Defendants Dr. Murray and Dr. Linthicum were deliberately indifferent to Cornelius' serious medical needs and that these violations of Cornelius' constitutional rights were the result of policies, practices, customs, or procedures promulgated by Dr. Murray and Dr. Linthicum.

89.     Defendants, Dr. Murray and Dr. Linthicum, implemented policies, customs and practices with deliberate, callous and conscious indifference to the constitutional rights of Cornelius and other TDCJ offenders, failed to ensure the implementation of practice of any policies,

---

[13]  Texas Department of Criminal Justice, *Texas Correctional Managed Health Care Committee*, http://www.tdcj.texas.gov/divisions/cmhc/index.html (last visited Nov. 12, 2018).
[14] *Id.*
[15] *See* TEX. GOV'T CODE §§ 501.131-.156 ("Subchapter E. Managed Health Care") (setting forth the composition, roles, and responsibilities of the CMHCC).

procedures, and practices necessary to provide constitutionally adequate medical services to Cornelius during his incarceration in at the Ferguson Unit; and further implemented de facto policies, procedures, and practices which actually interfered with or prevented Cornelius from receiving medical services and necessary medication.

90.    Facts supporting each of the elements of a § 1983 claim listed above are found in the "**Statement of Facts**" applicable to all claims, but generally establishes that a serious, life-threatening, and continuous custom of the understaffing of medical personnel at the Ferguson Unit resulting in:

      a.    A policy, custom, or practice of failing to provide offenders with their prescribed medications; and

      b.    A policy, custom, or practice of failing to monitor the confinement of inmates to ensure that they were receiving appropriate medical services and medication..

91.    These actions by Dr. Murray and Dr. Linthicum subjected Cornelius to confinement with inadequately staffed medical services and medication, such as:

      a.    Confinement conditions that do not provide necessary and prescribed medication;

      b.    Confinement conditions that fail to ensure that offenders of receiving their prescribed medications; and

      c.    Conditions of confinement that fail to provide proper monitoring of persons in administrative segregation with mental health issues.

92.    UTMB/TDCJ policy requires that each unit must maintain a written staffing plan that ensures a sufficient number of health care providers.  Nevertheless, throughout, Cornelius' incarceration, Dr. Murray continuously reported to Dr. Linthicum of the critical medical staff shortages at Ferguson unit and other facilities.  Critical vacancy rates, including the Ferguson Unit not having a psychiatrist and alarming shortages of nursing staff, were reported by Dr. Murray to Dr. Linthicum in June 2015, September 2015, December 2015, March 2016, June

2016 and in September 2016.  Despite their awareness of these critical shortages in staff and the policy requiring a sufficient number of staff, neither Dr. Murray nor Dr. Linthicum took any steps to alter the dangerous conditions or move Cornelius to a facility with proper medical staffing.  Moreover, based on the 81 offender grievances in the year preceding Cornelius' death, Dr. Murray and Dr. Linthicum had actual or constructive knowledge of these unconstitutional policies, practices, customs, and procedures involving the failure to deliver medication at the Ferguson Unit.

93.     Despite their actual or constructive knowledge of these unconstitutional policies, practices, customs, and procedures at the Ferguson Unit, Dr. Murray and Dr. Linthicum exhibited deliberate indifference by failing to correct or implement constitutionally adequate policies, customs, and/or practices that would insure that Cornelius and other offenders at the Ferguson Unit received proper medical care and were provided with prescribed medications.

94.     As a result of Dr. Murray's and Dr. Linthicum's unconstitutional policies, practices, customs, and procedures and deliberate indifference, Cornelius took his life because he was not being provided with the prescribed medication or proper monitoring necessary to treat and control his mental illness or moved to a facility wherein his serious medical needs could be treated.  In short, Plaintiffs suffered harm as a result of Dr. Murray's and Dr. Linthicum's deliberate indifference.

**2.     Claims against the Nurses.**

95.     The following Defendants -- Utley, Lovell, Bertram and Harris (hereinafter "Nurses[16]"), intentionally, and with deliberate indifference, deprived Cornelius of his clearly established federal constitutional rights, including, but not limited to:

---

[16] Although Plaintiffs refer to Nurses collectively at times, specific factual references are made concerning actions or inactions by specific nurses in this complaint – these are not global allegations.  As such, this pleading complies with current federal standards.  FED. R. CIV. P. 8 & 9.

      a.      His right to receive proper medical services and medications for any serious medical conditions; and

      b.      His right to be free from cruel and unusual punishment.

96.     Each of these Nurses had a duty to ensure that Cornelius received adequate medical care, including being given his prescribed medications and required monitoring, yet failed to do so.

97.     Under UTMB policy, persons in administrative segregation with mental health needs must receive both daily monitoring by medical and must receive their medication cell-side. Between June 2016 and July 2016, each of the Nurses was personally responsible for providing daily monitoring and providing Cornelius his prescribed medications yet failed to do so.   The records reveal no daily monitoring by a licensed health care provider as required under UTMB/TDCJ policy.  The last daily monitoring record of Cornelius ends June 30, 2016.

98.     The following represents each date in July 2016 in which Cornelius did ***not*** receive his medication and who was assigned to his location to provide the required daily monitoring and to provide "p.m." medication:

| Date | Housing Location | Nurse Assigned and On Shift | Nurse Assigned to PM Medication |
|---|---|---|---|
| July 1, 2016 | X Block | Utley | Nazifpour |
| July 9, 2016 | O Block | Bertram | Bertram |
| July 10, 2016 | O Block | Bertram | Bertram |
| July 12, 2016 | O Block | Utley | Harris |
| July 13, 2016 | O Block | Utley | Bertram |
| July 14, 2016 | O Block | Bertram | Bertram |
| July 15, 2016 | O Block | Utley | Harris |
| July 16, 2016 | O Block | Utley | Utley |

| Date | Housing Location | Nurse Assigned and On Shift | Nurse Assigned to PM Medication |
|------|------------------|----------------------------|---------------------------------|
| July 17, 2016 | O Block | Utley | Utley |
| July 18, 2016 | O Block | Bertram | Bertram |
| July 19, 2016 | O Block | Utley | Utley |
| July 20, 2016 | O Block | Utley | Harris |
| July 21, 2016 | O Block | Utley | Utley |
| July 25, 2016 | O Block | Utley | Utley |
| July 26, 2016 | O Block | Utley | Utley |
| July 29, 2016 | O Block | Utley | Utley |
| July 30, 2016 | O Block | Utley | Utley |
| July 31, 2016 | O Block | Utley | Utley |

99.     Each of these Nurses' actions were more than negligent as Cornelius' continued medical

issues (including his documented and diagnosed mental illness), his previous medical history,

and his prior history of harming himself or other when not properly medicated.  Yet, despite this

knowledge, each of these Nurses consciously chose not to ensure that Cornelius received

adequate medical care and was given his prescribed medication.  In direct violation of UTMB

policy, not one of these nurses recorded that medication was not given or the reason it was not

given.  The Nurses, through these actions, proximately caused the deprivation of Cornelius'

rights to due process of law and rights to be free from cruel or unusual punishment subjecting

him to periods of inhumane incarceration under unduly painful, horrifying, and dangerous

conditions resulting in the death of Cornelius.  The actions of the Nurses were singularly, or in

combination, a legal cause of death to Cornelius.

100.    Additionally, each of these Nurses and RN Lovell who supervised each of the Nurses and

was responsible to ensure that their duties were carried out, were acutely aware of the miserable

compliance rate of giving Cornelius his medication, and yet took no steps to provide him proper

medical care or medication.  Cornelius' medication was provided by the UTMB pharmacy in

blister-pak form specifically labelled for Cornelius.  Moreover, UTMB policies require that each

staff person giving medication must check the patient's electronic MAR[17] for the last does given,

before giving the next dose.  On each day that a nurse gave Cornelius his medication, the

previously ungiven medication would be obvious both visibly and in the electronic record.

Specifically, when Harris gave Cornelius his medication on July 11th, she knew he had not

received his medication on July 9th or 10th.  When Bertram gave him his medication on July 22nd,

she knew he had not been given his medication for the last 10 days!  Yet none of these nurses,

including RN Lovell, took any steps to alert a qualified mental health provider to the obvious

risk to Cornelius acting with deliberate indifference to his serious medical care needs.

101.    Cornelius was in serious need of medical treatment and required medication to treat his

mental illness and prevent him from harming himself or others, as was well known to each of the

nurse defendants.  Nonetheless, each nurse willfully and maliciously failed to provide Cornelius

with prescribed medications and insure that he received proper medical care.

102.    At all times material hereto, the nurses were employed by or under contract with TDCJ or

UTMB and acting within the course and scope of their employment and in furtherance of the

duties of their offices or employment.

103.    The Nurses clearly breached their constitutional duty to tend to basic human needs of

persons within their charge, acting with deliberate indifference and subjective recklessness to the

clear needs of Cornelius, of which they had subjective knowledge.  The Nurses had full

knowledge of Cornelius' prior medical history and his medication requirements; however, they

---

[17] Medication Administration Record.

made a conscious decision not to ensure that he was given his prescribed medications daily and not to provide him the necessary medical care as required under the United States Constitution. Given Cornelius' prior medical history while at the Ferguson Unit, including multiple instances of self-harm and threatening suicide, the Nurses deliberately disregarded the serious risk of medical harm.

104.    The aforementioned acts resulted in the delay and ultimately the failure to provide any of the necessary medical treatment to Cornelius, which in turn proximately caused his death.

### 3.    Claims against Sheri Nichols-Woodward

105.    Nichols-Woodward intentionally, and with deliberate indifference, deprived Cornelius of his clearly established federal constitutional rights, including, but not limited to:

        a.    his right to reasonably safe conditions of confinement;

        b.    his right to receive proper medical services and medications for any serious medical conditions; and

        c.    his right to be free from cruel and unusual punishment.

106.    Nichols-Woodward had a duty to ensure that Cornelius received proper medical care, medication and safety from harm, yet failed to do so.  Her repeated failures to refer Cornelius for psychiatric care or transfer him to an inpatient facility like Skyview or Jester where he could receive psychiatric care for his mental illness, or to order proper suicide-prevention precautions were more than negligent as Cornelius' documented and readily apparent medical and mental issues, his lack of medication and documented suicidal ideations were obvious to Nichols-Woodward.  Yet, Nichols-Woodward consciously chose not to ensure that Cornelius received adequate medical and mental health care, medication or monitoring.  Nichols-Woodward proximately caused the deprivation of Cornelius' rights to due process of law and rights to be free from cruel or unusual punishment subjecting him to periods of incarceration under unduly

painful, horrifying, and dangerous conditions resulting in his death.  The actions of Nichols-Woodward were singularly, or in combination, a legal cause of death to Cornelius.

107.    Cornelius was in serious need of medical attention and treatment and protection from harm, as was well known by Nichols-Woodward.  Nonetheless, Nichols-Woodward willfully and maliciously refused to summon psychiatric medical care for Cornelius, ensure the provision of medication, or to properly monitor and protect him from self-harm.

108.    At all times material hereto, Nichols-Woodward was an employee of UTMB and a state actor for UTMB, and within the course and scope of her employment and in furtherance of the duties of her offices or employment.

109.    Nichols-Woodward, acting with deliberate indifference and subjective recklessness to the clear needs of Cornelius, of which she had subjective knowledge, made a conscious decision not to monitor Cornelius properly, not to make an urgent referral for mental health care, not to provide him with proper assessment or medication, and not to advise the security staff to take suicide precautions.  Given Cornelius' medical history, coupled with his actions while in prison, Nichols-Woodward deliberately disregarded the serious risk of harm.  Further, Nichols-Woodward failed to take the requisite steps to arrange for medical and mental health assessment or treatment, failed to provide medication and failed to ensure monitoring for his own safety.

110.    The aforementioned acts resulted in the delay and ultimately the failure to provide any of the necessary medical treatment to Cornelius, which in turn proximately caused his death.

**B.    Qualified Immunity under § 1983**

111.    TDCJ or UTMB employees, who were carrying out a discretionary function can be entitled to qualified immunity to their individual liability, but this immunity is waived if the complainant shows that:

a.      the individual's acts deprived the party of constitutional rights under color of law

b.      the deprived rights were clearly established and constitutional rights which existed at the time of the acts; and

c.      such acts were not objectively reasonable under the circumstances, that is, no reasonable official could have believed at the time that the conduct was lawful.

112.    Dr. Murray and Dr. Linthicum were persons acting under color of state law, when creating, promulgating, and enforcing TDCJ or UTMB policies, customs, and procedures for incarceration of persons, or by their failure to enforce policies which resulted in depriving Cornelius of his civil liberties without due process of law by failing to provide adequate medical assistance during his incarceration, which included days of distress and ultimately resulted in his death at the facility.  No reasonable TDCJ and/or UTMB official could have believed that seriously understaffing a prison medical facility for months on end was lawful.  Reasonable officials would know that critical understaffing would lead to the denial of medical care, including the provision of medications and monitoring.  The acts of Dr. Murray and Dr. Linthicum, when viewed objectively, were unreasonable under the circumstances.  Therefore, qualified immunity is waived in this case.

113.    The Nurses and Nichols-Woodward, persons acting under color of state law, deprived Cornelius of his civil liberties without due process of law by failing to provide adequate medical assistance during his incarceration, which included days of distress and ultimately resulted in his death at the facility.  No reasonable TDCJ and/or UTMB employee could have believed that depriving or failing to provide an individual with his prescribed medications or daily monitoring for prolonged periods of time or failing to refer Cornelius for psychiatric care was lawful.  The acts of the Nurses and Nichols-Woodward, when viewed objectively, were unreasonable under the circumstances.  Therefore, qualified immunity is waived in this case.

114.     The Nurses and Nichols-Woodward, acting under color of state law, were deliberately indifferent to the excessive risk to Cornelius' health and safety in their acts, or failures to act. Such acts violated and deprived Cornelius' clearly established constitutional rights and were not objectively reasonable.

115.     The acts of Dr. Murray, Dr. Linthicum, the Nurses and Nichols-Woodward clearly violated established statutory or constitutional rights of which a reasonable person would have known, including the constitutional rights afforded by the Due Process Clause, and Eighth and Fourteenth Amendments of the United States Constitution.[18]

116.     The acts of Defendants were so obviously and grossly wrong, that only a plainly incompetent government official, or one who was knowingly violating the law, would have performed such an act, and, therefore, Defendants are liable to Plaintiffs for the damages caused by their actions.

## C.     Title II of ADA and RA claims against UTMB

117.     Title II of the American with Disabilities Act and the Rehabilitation Act require public entities to reasonably accommodate people with disabilities in all programs and services for which people with disabilities are otherwise qualified.

---

[18] The failure to provide an inmate in one's care with his prescribed medications is objectively unreasonable considering clearly established law. *See Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976) (deliberate indifference to a prisoner's serious illness or injury is actionable a violation of the Eighth Amendment and is actionable under § 1983); *Dadd v. Anoka Cty.*, 827 F.3d 749, 757 (8th Cir. 2016) ("When an official denies a person treatment that has been ordered or medication that has been prescribed, constitutional liability may follow."); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (prisoner's allegation that a guard denied him his prescribed medication was sufficient to overcome the assertion qualified immunity); *Foulks v. Cole Cty.*, 991 F.2d 454, 457 (8th Cir. 1993) ("The law was clearly established at the time of [plaintiff's] injury that if a reasonable official would have known that observation and treatment was necessary, the refusal to provide access to the treatment would constitute deliberate indifference to [plaintiff's] constitutional rights); *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (noting that prison officials' interference with a prescribed plan of treatment can constitute a constitutional violation); *Byrd v. Wilson*, 701 F.2d 592, 594 (6th Cir. 1983) (holding that a prisoner who was unable to get his prescribed medication for several days could state a claim for deliberate indifference to medical needs); *Partridge v. Two Unknown Police Officers of City of Houston, Tex.*, 791 F.2d 1182, 1187 (5th Cir. 1986).

118.    Failure to provide reasonable accommodations is illegal discrimination under the Acts, and entitles a plaintiff to compensatory damages.

119.    The Rehabilitation Act also requires federal funds recipients to reasonably accommodate persons with disabilities in their programs and services.  UTMB is a recipient of federal funds.

120.    The Ferguson Unit is a facility, and its medical operation comprises a program and service for Rehabilitation Act and ADA purposes.

121.    The incarceration, safe housing, the DDP, "crisis management", inpatient psychiatric care and "constant and direct observation" among other things, are programs and services UTMB provided to person incarcerated.

122.    Cornelius was a qualified individual with a disability under the meaning of both the ADA and Rehabilitation Act.  Cornelius had a mental impairment that substantially limited one or more of his major life activities, or the operation of one or more of his major bodily systems. Specifically, Cornelius's mental illness impaired the operation of his brain, and substantially limited his ability to think, properly communicate and care for himself, as described above.  *See* 42 U.S.C. sec. 12102(1)-(2).

123.    UTMB officials, like Nichols-Woodward, Gougler and Gardner knew Cornelius was a qualified individual with a disability.  UTMB knew Cornelius's mental illness had resulted in prior suicide attempts and self-injury while in their custody and care.  UTMB knew that Cornelius' mental state was seriously decreasing in the 90 days leading to his death as he made repeated attempts (12 mental health requests) to seek help and even outwardly threatened suicide and engaged in self-injurious behavior.

124.    Despite this knowledge, UTMB intentionally discriminated against Cornelius by denying him reasonable accommodations for his serious mental illness.

125.     UTMB denied Cornelius the reasonable accommodations of the care of a licensed psychiatrist, admission to an inpatient psychiatric facility, emergency admission to crisis management when it was obvious Cornelius needed immediate temporary care, reasonable accommodation of instructing TDCJ security to safely house Cornelius in a multi-person cell where a cellmate could alert officers that Cornelius was beginning to hang himself, assignment to a cell without the means to hang himself such as bedsheets and tie-off points, or provide "constant and direct observation" until transfer to a facility that could properly monitor and provide medication to Cornelius when the Ferguson Unit's complete inability to do so was apparent.

126.     Thus, as alleged above, UTMB failed and refused to reasonably accommodate Cornelius' mental disability while he was in custody and denied him access to programs and services UTMB offered to otherwise qualified individuals.  UTMB denied Cornelius access to crisis management, constant and direct observation, medication and generally denied him safe housing in TDCJ facilities while he was incarcerated causing him to suffer more pain and punishment than able-bodied prisoners.

127.     UTMB does not enjoy Eleventh Amendment immunity from these claims.  *U.S. v. Georgia,* 126 S.Ct. 877, 882 (2006); *Pace v. Bogahesa City Sch. Bd.*, 403 F.3d 272, 288-89 (5th Cir. 2005).

## VII.  <u>DAMAGES</u>[19]

128.     Plaintiffs hereby adopt, incorporate, restate and re-allege paragraphs 1 through 127, inclusive, regarding all causes of action.

129.     As a result of Defendants' constitutional violations, Plaintiffs have suffered serious and

---

[19] Plaintiffs are not asserting a claim for monetary damages against Dr. Murray or Dr. Linthicum in their official capacities.

substantial damages and injuries, for which they request the award of the following categories of

damages,

Wrongful Death:

a.      Mental anguish, including emotional pain, torment and suffering that Plaintiffs
        have separately experienced due to the death of their son;

b.      The pecuniary loss of care, maintenance, support, services, advise, counsel and
        reasonable contributions of pecuniary value that Plaintiffs have sustained and lost
        in reasonable probability due to the death of their son;

c.      The loss of society and companionship representing the positive benefits flowing
        from the love, comfort, companionship and society that Plaintiffs have sustained
        in reasonable probability due to the death of their son;

Survivorship Claims:

d.      Physical Pain and suffering endured by CORNELIUS LEWIS throughout his
        confinement and leading up to his impending death recoverable by the estate;

e.      Mental anguish, including emotional pain, torment, and suffering that
        CORNELIUS LEWIS endured during his confinement leading up to his death
        recoverable by the estate;

f.      Burial expenses incurred by CORNELIUS LEWIS' estate resulting from his
        death; and

g.      These damages should be separately assessed by the jury regarding each
        individual Plaintiff.  A fair and impartial jury should listen to the evidence and
        award an amount for each element of damages that is just, and fair based on the
        evidence.

130.    Under Texas Law, Fredrick and Janice are Cornelius's only heirs-at-law.  *See* TEX.

ESTATES CODE § 201.001(c).  Cornelius died without a will and was never married and had no

children.  Accordingly, under the Texas intestate succession statute, Cornelius's estate is to be

divided equally between Bernard and Janice, who have both jointly filed this action.  *See id.*

Further, there is no administration pending with respect to Cornelius' estate and no

administration is necessary because all heirs-at-all are joined in this action and under Texas law

any damages award to Cornelius' estate would be split equally between them.  See *Austin*

*Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 851 (Tex. 2005); *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998); *see also* TEX. ESTATES CODE § 201.001(c).  Moreover, Fredrick and Janice have executed a family agreement by which they agree to an equal division of Cornelius' estate. Thus, Fredrick and Janice have standing and capacity to bring a survival action on behalf of Cornelius for the benefit of Cornelius's estate.  *See id.*

131.    Plaintiffs assert the wrongful death claims on behalf of, and for the benefit of, all wrongful death beneficiaries.

132.    Pursuant to 42 U.S.C. § 1983, Plaintiffs are also entitled to recover and hereby request the award of exemplary damages as to the Nurses and Nichols-Woodward.

## VIII.  ATTORNEY'S FEES AND COSTS

133.    Pursuant to the Civil Rights Attorney's Fees Award Act, 42 U.S.C. § 1988, Plaintiffs assert the right to an award of attorney's fees and costs under its 42 U.S.C. § 1983, 42 U.S.C. § 12131, 12133, and 29 U.S.C. § 794a, if they prevail.

## IX.  RELIEF REQUESTED

134.    The preceding factual statements and allegations are incorporated by reference.

135.    For these reasons, Plaintiffs pray for judgment against Defendants, any or all of them, for the following:

    a.    Actual damages;

    b.    Pre-judgment and post-judgment interest;

    c.    Attorney's fees and expenses;

    d.    Punitive and exemplary damages against individual defendants in an amount to be determined;

    e.    Costs of Court; and

    f.    Such other and further relief as the Court deems just and equitable.

## X.  JURY DEMAND

136.    Plaintiffs respectfully demand trial by jury.

## XI.  PRAYER

WHEREFORE, Plaintiffs respectfully request Defendants to be cited to appear and answer herein, and that upon final trial hereof, the Court award the relief against Defendants jointly and severally.

Plaintiffs further respectfully requests that they be afforded all due expediency within the discretion of this Honorable Court to facilitate the preservation of evidence, to demonstrate that such unconscionable conduct will not be tolerated in a civilized society, and to ensure that justice may be served.

Respectfully submitted,

**THE BERNSEN LAW FIRM**

_____

**David E. Bernsen**
Texas Bar No. 02217500
Southern District No. 83425
dbernsen@bernsenlaw.com
**Christine L. Stetson**
Texas Bar No. 00785047
Southern District No. 17641
cstetson@bernsenlaw.com
**Tanner G.M. Franklin**
Texas Bar No. 24082506
Southern District No. 3137898
tfranklin@bernsenlaw.com
420 N. MLK, Jr. Pkwy
Beaumont, Texas 77701
409/212-9994 – Telephone
409/212-9411 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served on the following counsel by mail, electronically and/or via facsimile on the 20th day of March, 2019:

Jeanine M. Coggeshall
Assistant Attorney General
Post Office Box 12548, Capitol Station
Austin, Texas 78711
Jeanine.Coggeshall@oag.texas.gov

Heather Rhea
Assistant Attorney General
Post Office Box 12548, Capitol Station
Austin, Texas 78711
Heather.rhea@oag.texas.gov

Jonathan C. LaMendola
Cobb Martinez Woodward, PLLC
1700 Pacific Ave., Suite 3100
Dallas, Texas 75201
jlamendola@cobbmartinez.com

_____
Christine L. Stetson