IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CORNELIUS DESHUN LEWIS, *et al.*, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. H-18-311 |
| YOLANDA SMITH, *et al.*, | § § § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Cornelius Lewis, an inmate in the Texas Department of Criminal Justice, Ferguson Unit, committed suicide in July 2016 by hanging himself in his prison cell. (Docket Entry No. 75 at 16). His parents, Fredrick Bernard Lewis and Janice Marie Close, sued 27 state officials, alleging violations of the Eighth and Fourteenth Amendments. In December 2018, the court dismissed the claims against several defendants, with leave to conduct limited discovery and to replead. The plaintiffs filed a third amended complaint, asserting claims against the University of Texas Medical Branch, known as "UTMB"; Doctors Owen J. Murray and Lannette Linthicum; Registered Nurse Virginia Lovell; Licensed Professional Counselor Sheri Nichols-Woodward; and Licensed Vocational Nurses Michael W. Utley, Nicole M. Bertram, and Melissa A. Harris. (Docket Entry No. 97). Nurses Bertram and Harris have separately moved to dismiss the complaint, the plaintiffs responded, and the parties replied and surreplied. (Docket Entry Nos. 101, 109, 112, 115, 117, 120). The court heard oral argument in May 2019.

After a careful review of the pleadings; the motions, responses, reply, and surreply; the record; counsels' arguments; and the applicable law, Nurse Bertram's and Harris's motions to

dismiss are granted, with prejudice and without leave to amend. The reasons are explained in detail below.

I.  **Background**

This case's allegations were detailed in the court's December 2018 Memorandum Opinion and Order. (Docket Entry No. 84). The court focuses here on the allegations related to Nurses Bertram and Harris. In 2014, Lewis was convicted of robbery and unlawfully carrying a weapon, and a Texas court sentenced him to three years in prison. (Docket Entry No. 97 at 8). After his sentencing, Lewis went to a Texas Department of Criminal Justice, or "TDCJ", intake center, where he received two medical screens. (*Id.* at 8–9). The first medical screen found that Lewis had been taking anti-depressant, anti-anxiety, and anti-psychotic medications during his time at the county jail. (*Id.* at 9). The medical examiners discontinued these medications and prescribed him Sertraline and Risperidone for 30 days. (*Id.*). In the second medical screen, Lewis informed the examiners that he "suffered from mental illness and was taking medication." (*Id.*).

Lewis was transferred to the TDCJ's Hodge Unit for the developmentally disabled following his medical screens. (*Id.*). During his time at the Hodge Unit, Lewis became increasingly "aggressive" and acted "strangely." (*Id.*). Lewis met with Efraim Reese, a licensed professional counselor, who "noted that [Lewis] denied any problems, but that his behavior declined rapidly during the interview." (*Id.* at 9–10). Lewis was not admitted into the developmentally disabled program. Lewis returned to the intake center in June 2015. Frances McGinnis, a clinical nurse specialist at the intake center, met with Lewis and extended his Sertraline and Risperidone prescriptions. (*Id.* at 10).

Lewis was transferred to another prison in mid-June, and then to the Jim Ferguson Unit on July 23, 2015. (*Id.*). Lewis had a mental-health screen the day after his arrival at the Ferguson

2

Unit, flagging him as an individual with "a serious mental disorder, depressive disorders with psychosis, psychosis disorders, . . . organic brain syndrome," and possibly having a "schizoaffective disorder or schizophrenia." (*Id.* at 11). Lewis had a psychological evaluation on July 27, 2015, and the examiner found that Lewis was "refusing his medication" and his "medication compliance rate . . . was under 50%." (*Id.*). In August, a case manager noted that Lewis "was not taking his meds because of their [e]ffect" and kept him under mental-health "monitoring." (*Id.*). On August 27, Lewis cut his finger with a razor, and then, on August 31, he fought with another inmate and suffered minor injuries. (*Id.* at 13).

On September 3, 2015, Lewis had a teleconference with John Q. Wang, a physician's assistant, for a psychological evaluation and an individualized treatment plan. (*Id.* at 12). Lewis told Wang of a "prior hanging incident and previous free world psych hospital stays." (*Id.*). Wang noted Lewis's "erratic behavior, poor ability to comprehend[,] and anxiety." (*Id.*). Wang diagnosed Lewis with anxiety disorder, ruling out other conditions. (*Id.*). Wang set Lewis's status as "psychiatric-non-serious depressive disorder, temporary," and prescribed Lewis Citalopram instead of the Risperidone and Sertraline. (*Id.*).

In early October, Lewis met with Sheri Nichols-Woodward, a licensed professional counselor, after Lewis submitted a grievance stating that he wanted to kill himself. (*Id.* at 13–14). Lewis told Nichols-Woodward that he had been "hearing voices." (*Id.* at 14). Nichols-Woodward noted that Lewis's "medical compliance was now 75%" and that Lewis had "no current mental health needs." (*Id.*).

A few months later, on December 7, Lewis asked to see Nichols-Woodward again. Nichols-Woodward met with Lewis on December 10, finding that "he had no current mental healthcare needs." (*Id.*). On December 12, Lewis filed a complaint that he had not received his

prescribed medication. (*Id.*). The next week, Lewis was treated for a suspected self-inflicted cut on his left arm. (*Id.*). Nichols-Woodward saw Lewis again on December 23, 2015.

Lewis asked to see Nichols-Woodward many times between January and March 2016, seeking help, expressing concerns for his safety, and worrying that "everyone on his [U]nit was trying to hurt him." (*Id.* at 13–15). Nichols-Woodward tracked Lewis's medication compliance; stated that he was in an "offender protection investigation"; and noted that while Lewis had "thoughts of self-injury," he "denied plans" to harm himself. (*Id.*). Nichols-Woodward concluded that Lewis had "no current mental health needs." (*Id.*).

On March 10, 2016, Lewis had a mental-health appointment with Wang by teleconference. Wang stated that Lewis's "anxiety was in remission and that [Lewis] stated he had no mood issues and no longer needs meds." (*Id.* at 16). Based on Lewis's representations, Wang "stopped all [Lewis's] medications and psych[ological] services." (*Id.*). Three days later, Lewis complained that he had trouble with his medication and wanted to try Zoloft. (*Id.*). Lewis was told that "he wouldn't get any more medication." (*Id.*). Lewis met with two more mental-health professionals in March, seeking medications "to calm him down," but they told him that his prescriptions had been stopped. (*Id.*).

In late April, security staff and Nichols-Woodward referred Lewis to crisis management after he had been treated for self-mutilation and had said that "[I] seriously needed help, that I've been cutting myself and trying to hang myself. I need help." (*Id.* at 16–17). Because crisis management had no space for Lewis, he was instead placed under "constant direct observation." (*Id.* at 17). A few days later, on May 2, 2016, Lewis stated that he "needed help" because he was "cutting himself, hanging himself, and eating off the ground." (*Id.*). Lewis met with Nichols-

4

Woodward that day, but he denied that he needed help or had injured himself. (*Id.*). Nichols-Woodward found that Lewis was not a suicide risk. (*Id.*).

Between May and June 2016, Lewis met with Nichols-Woodward a number of times. In late May, after a session with Lewis, Nichols-Woodward opined that Lewis had been "faking a psychotic episode." (*Id.*). On June 6, Lewis went to see Nichols-Woodward after making threats to hurt himself. (*Id.*). Lewis denied attempting to hurt himself, but he requested to be put back on medication, and Nichols-Woodward scheduled Lewis for a mental-health appointment with Wang. (*Id.*). On June 11, before his appointment, Lewis was found with the letter "X" carved into his torso and arms after an alleged fight with his cellmate. (*Id.* at 17–18).

Lewis had a teleconference appointment with Wang on June 16, 2016. (*Id.* at 18). Wang diagnosed Lewis with "Anxiety Disorder/Impulse Control Disorder" and prescribed Divalproex, a medication used to treat manic bipolar disorder. (*Id.*). Lewis met with Nichols-Woodward and another mental-health professional several times between June and July 2016, and he at least once complained that he had not received his Divalproex as prescribed. (*Id.* at 18–19). On July 31, around 12:35 p.m., Lewis was found dead in his cell. He had used a bedsheet to hang himself. (*Id.* at 19).

Lewis's parents sued a number of TDCJ and UTMB employees, including Nurses Bertram and Harris. (*Id.* at 24–28). The plaintiffs' third amended complaint asserts that Nurses Bertram and Harris were deliberately indifferent to Lewis's serious medical needs, in violation of his constitutional rights, by failing to give Lewis his prescribed medications, by failing to correct the Ferguson Unit's inconsistency in administering his medication, and by failing to alert mental-health professionals that Lewis was not receiving his medication as prescribed. (*Id.*). The plaintiffs allege that Nurses Bertram and Harris should have known that Lewis presented a

substantial risk of harming himself when he did not take his medication as prescribed because of his history of self-harm and violence when unmedicated. (*Id.*).

The plaintiffs' allegations focus on how often Lewis received his prescribed medications, making his medication records especially important. The plaintiffs attached Lewis's "Patient Medication Compliance Report" to the second amended complaint, which may be considered because it is central to and referenced in the third amended complaint. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 634 (5th Cir. 2014). The Compliance Report shows that McGinnis prescribed Sertraline and Risperidone on June 11, 2015, and cancelled those prescriptions on September 3, 2015. (Docket Entry No. 75-2 at 3, 6). The Compliance Report supports an inference that Lewis was not given Sertraline or Risperidone at the Ferguson Unit between July 23 and August 27, and then from August 29 to 31, 2015, a 38-day lapse. (*Id.*).

Wang prescribed Citalopram on September 3, 2015, and stopped the prescription on March 14, 2016. (*Id.* at 7). The Compliance Report supports an inference that Lewis was not given Citalopram on 42 of the 193 days it was prescribed. (*Id.* at 7–14). Lewis properly received Citalopram 78% of the time. The dates that Lewis did not receive Citalopram were:

- September 30, 2015
- October 1, 3, 5, 7–8, 24, 2015
- November 15, 20, 27, 30, 2015
- December 2–14, 19–20, 23, 26, 29, 2015
- January 18, 24, 25, 29, 30, 2016
- February 3, 12, 13, 19, 23, 26, 2016
- March 1, 5, 2016

(*Id.*). The Compliance Report shows that Lewis refused Citalopram on October 30, November 29, and December 1, 2015. (*Id.* at 8–9).

Wang prescribed Divalproex on June 16, 2016, at 9:42 a.m. (*Id.* at 16). The Compliance Report supports a plausible inference that Lewis was not given his Divalproex on 9 out of the 44

6

days it was prescribed, including the two days before his suicide. (*Id.* at 15–16). He received Divalproex as prescribed 80% of the time. The dates that Lewis did not receive Divalproex were June 16, 17, 25, 2016; and July 1, 9, 25, 26, 29–30, 2016. (*Id.*). Lewis was found dead on July 31, 2016. (Docket Entry No. 97 at 19).

Bertram and Harris were licensed nurses who worked in the Jim Ferguson Unit as employees of the UTMB. (*Id.* at 5). Under UTMB policy, the plaintiffs allege, the Nurses had to monitor Lewis during their shifts and administer his prescribed medication. (*Id.* at 25). The plaintiffs assert that Nurses Bertram and Harris deprived Lewis of his constitutional rights to treatment for serious medical conditions and to be free from cruel and usual punishment, under the Eight and Fourteenth Amendments, by failing to ensure that Lewis received his prescribed medication, by failing to record whether his medication was administered, and by failing to alert a mental-health professional that Lewis had not been receiving his prescribed medication. (*Id.* at 24–25). According to the third amended complaint, Nurse Bertram failed to give Lewis his prescribed medication on July 9–10, 13–14, and 18, 2016, and Nurse Harris failed to do so on July 12, 15, and 20, 2016. (*Id.* at 25).

The plaintiffs allege that Nurses Bertram and Harris "were more than negligent" based on Lewis's "continued medical issues (including his documented and diagnosed medical illness), his previous medical history, and his prior history of harming himself or other[s] when not properly medicated." (*Id.* at 26). The plaintiffs allege that Nurses Bertram and Harris "were acutely aware of the miserable compliance rate of giving [Lewis] his medication," because any nurse administering medication had to "check the patient's electronic [Medical Administration Record] for the last [dose] given, before the next dose," and because Lewis's medications came in "blister-pak form specifically labelled for [Lewis]." (*Id.* at 27). They also allege that, "[o]n each day that

7

a nurse gave [Lewis] his medication, the previously ungiven medication would be obvious both visibly and in the [Medical Administration Record]." (*Id.*). According to the plaintiffs, "when [Nurse] Harris gave [Lewis] his medication on July 11th, she knew he had not received his medication on July 9th or 10th," and "[w]hen [Nurse] Bertram gave [Lewis] his medication on July 22nd, she knew he had not been given his medication for the last 10 days." (*Id.*).

Nurses Bertram and Harris separately moved to dismiss the third amended complaint. (Docket Entry Nos. 101, 109). They argue that the third amended complaint does not allege facts that create a plausible inference that either of them acted with deliberate indifference, necessary for Eighth or Fourteenth Amendment violations, and that they are entitled to qualified immunity. (Docket Entry No. 101 at 4–7; Docket Entry No. 109 at 10–13).

The plaintiffs respond that Nurses Bertram and Harris were "subjectively aware that [Lewis] was not being given his medications based on the administered medications in his blister-pak and his [M]edication [A]dministration [R]ecord, which [Nurses] Bertram [and Harris were] required to review prior to giving [Lewis] his medications." (Docket Entry No. 112 at 13–14; Docket Entry No. 115 at 13). According to the plaintiffs, these allegations support a plausible inference that Nurses Bertram and Harris knew of Lewis's serious medical condition and were aware that he had not been receiving his medication as prescribed. (Docket Entry No. 112 at 13–15; Docket Entry No. 115 at 13–14). The plaintiffs also argue that Nurses Bertram and Harris are not entitled to qualified immunity because failing to give an inmate his prescribed medications is "objectively unreasonable considering clearly established law." (Docket Entry No. 112 at 18; Docket Entry No. 115 at 18). Nurse Bertram replied, and the plaintiffs surreplied. (Docket Entry Nos. 117, 120).

The parties' arguments are considered below.

8

## II. The Applicable Legal Standards

### A. Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550, U.S. at 556).

To withstand a Rule 12(b)(6) motion, a "complaint must allege 'more than labels and conclusions,'" and "a formulaic recitation of the elements of a cause of action will not do." *Norris v. Hearst Tr.*, 500 F.3d 454, 464 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 557). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*,

550 U.S. at 555). "Conversely, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, this basic deficiency should be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* (quoting *Twombly*, 550 U.S. at 558) (internal quotation marks and alteration omitted).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend under Rule 15(a) before dismissing the action with prejudice, unless doing so would be futile. *See Carroll v. Fort James Corp.*, 470 F.3d 1171, 1175 (5th Cir. 2006) (Rule 15(a) "evinces a bias in favor of granting leave to amend"); *Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."). A court may deny a motion to amend for futility if an amended complaint would not state a claim on which relief could be granted. *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (citing *Stripling v. Jordan Prods. Co., LLC*, 234 F.3d 863, 873 (5th Cir. 2000). The decision to grant or deny leave to amend "is entrusted to the sound discretion of the district court." *Persuasive Software Inc. v. Lexware GMBH & Co.*, 688 F.3d 214, 232 (5th Cir. 2012).

### B. Qualified Immunity

Qualified immunity protects government officials, including prison officials, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Osborne v. Harris Cty.*, 97 F. Supp. 3d 911, 923 (S.D. Tex. 2015) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). "A plaintiff seeking to overcome qualified immunity must show: '(1) that the official

violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). If the plaintiff fails to show that the official's conduct violated an established constitutional right, the inquiry ends, and that official is immune from liability. *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). "A court has discretion to decide which prong to consider first." *Whitley v. Hanna,* 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009)). The plaintiff has the burden of overcoming the qualified-immunity defense. *Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar Cty.*, 560 F.3d 404, 410 (5th Cir. 2009) (quotation omitted). "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates the law.'" *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (alteration omitted) (quoting *al-Kidd*, 563 U.S. at 739–42). "To answer that question in the affirmative, [the court] must be able to point to controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Id*. (quoting *al-Kidd*, 563 U.S. at 741–42). "The unlawfulness of the defendant's action must have been readily apparent from sufficiently similar situations, but it is not necessary that the defendant's exact act have been illegal." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010) (citing *Brown v. Miller*, 519 F.3d 231, 236–37 (5th Cir. 2008)).

**III. Analysis**

Before addressing whether the asserted constitutional rights are clearly established, the court examines whether the plaintiffs have alleged plausible Eighth or Fourteenth Amendment violations. In the prison context, "[i]t is the Eighth Amendment that is relevant to claims of the denial of medical care." *Carlucci v. Chapa*, 884 F.3d 534, 540 (5th Cir. 2018). "[T]he Due Process Clause affords no greater protection than does the Cruel and Unusual Punishments Clause." *Id.* (alteration omitted) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

"The denial or delay of treatment for serious medical needs violates the Eighth Amendment, which prohibits cruel and unusual punishment." *Id.* at 538; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "To show a violation of the Eighth Amendment, the plaintiff must prove: (1) 'objective exposure to a substantial risk of serious harm'; and (2) 'that prison officials acted or failed to act with deliberate indifference to that risk.'" *Carlucci*, 884 F.3d at 538 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)). A prison official violates the Eighth Amendment by "deliberate indifference to a prisoner's serious medical needs, which equates to the 'unnecessary and wanton infliction of pain.'" *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). A serious medical condition is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id.* (quoting *Gobert*, 43 F.3d at 345 n.12). The test is "medical necessity," not "desirability." *Id.* (quoting *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. Unit A 1981)).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410

(1997)). It requires the actor to have "a subjectively culpable state of mind." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994)). "A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'" *Id.* (quoting *Gobert*, 463 F.3d at 346). "Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, 'nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.'" *Id.* (quoting *Gobert*, 463 F.3d at 346). Deliberate indifference is "an extremely high standard to meet." *Arenas*, 922 F.3d at 620 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

The plaintiffs argue that the allegations support a plausible inference of deliberate indifference because they pleaded that Nurses Bertram and Harris "had full knowledge of [Lewis's] history of serious medical/mental health needs and his history of hurting himself or others when he was not provided his prescribed mental health medications." (Docket Entry No. 112 at 14; *see* Docket Entry No. 115 at 13). The third amended complaint alleges that Nurses Bertram and Harris each failed to give Lewis his prescribed medication between 3 and 5 times in the month before his suicide on July 31, 2016. (Docket Entry No. 97 at 25–26). It alleges that the nurses "were more than negligent" in failing to do so given Lewis's "continued medical issues . . . , his previous medical history, and his prior history of harming himself or other[s] when not properly medicated." (*Id.* at 26). The Nurses allegedly "had full knowledge of [Lewis's] prior medical history and his medication requirements" because UTMB policy required them to check his "last [dose] given, before giving the next dose," and because Lewis's medication came "in blister-pak form specifically labelled for [him]." (*Id.* at 27–28).

To have acted with deliberate indifference, the nurses must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also [have] draw[n] the inference." *Farmer*, 511 U.S. at 837; *cf. Arenas*, 922 F.3d at 621 ("Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care."). The allegations must support a plausible inference that the nurses had actual, subjective awareness of a substantial risk of serious harm. *See Farmer*, 511 U.S. at 884; *Arenas*, 922 F.3d at 620.

The conclusory allegations that Nurses Bertram and Harris "knew" Lewis had not received his medication and "had full knowledge" of his medical history and medication requirements are not entitled to an assumption of truth, even on a motion to dismiss. (Docket Entry No. 97 at 27); *see Iqbal*, 556 U.S. at 681 ("These bare assertions . . . amount to nothing more than a 'formulaic recitation of the elements' of a constitutional . . . claim." (quoting *Twombly*, 550 U.S. at 555)).

The plaintiffs' other allegations, at most, show that Nurses Bertram and Harris were negligent in following UTMB policies and failing to administer Lewis's medication as prescribed. The third amended complaint alleges that the nurses had access to Lewis's Medication Administration Records and had to check them before giving Lewis medication. (Docket Entry No. 97 at 27). These allegations do not support a plausible inference that Nurses Bertram and Harris actually reviewed the Records, gained subjective knowledge of Lewis's medication and medical history, drew the inference before his suicide that Lewis was a suicide risk, and then disregarded that risk. *See Farmer*, 511 U.S. at 837. While the allegations support an inference that Nurses Bertram and Harris were negligent in performing their duties, "acts of negligence, or medical malpractice[,] do not constitute deliberate indifference." *Gobert*, 463 F.3d at 346; *see also Brown v. Bolin*, 500 F. App'x 309, 315 (5th Cir. 2012) ("Negligence or even gross negligence is not enough."). Because the third amended complaint does not support a plausible inference that

14

Nurses Bertram and Harris "were aware of a substantial and significant risk that [Lewis] might kill [himself]," the plaintiffs have failed to state Eighth or Fourteenth Amendment claims against them. *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 395 (5th Cir. 2000). These claims must be dismissed.

## IV. Conclusion

The third amended complaint fails to allege facts supporting a plausible inference that either Bertram or Harris was deliberately indifferent to Lewis's serious medical needs. Nurse Bertram's and Harris's motions to dismiss are granted, (Docket Entry Nos. 101, 109), with prejudice and without leave to amend, because the plaintiffs have had three tries at amending the complaint and a fourth would be futile.

SIGNED on July 8, 2019, at Houston, Texas.

                                                   Lee H. Rosenthal
                                      Chief United States District Judge